742 P.2d 851

**ARIZONA PUBLIC SERVICE COMPA-NY, an Arizona corporation, Defendant Third-Party Plaintiff-Appellant,**

**v.**

**Gordon SHEA, individually and as agent for the landowners and business operators of Shea Arabian Horse Ranch; John Trevizo; Ignatio Ramos, Third-Party Defendants-Appellees.**

**No. 1 CA–CIV 8801.**

Court of Appeals of Arizona, Division 1, Department D.

Aug. 6, 1987.

Review Denied Oct. 7, 1987.

a helper on a hay delivery truck. The delivery truck was driven by Ignatio Ramos, an employee of John Trevizo, d/b/a Trevizo Hay Company. Ramos was delivering a load of hay to Shea Arabian Horse Ranch operated by Gordon Shea. The overhead power line belonged to Arizona Public Service Company (APS). Ruelas sued APS, who in turn filed a third party complaint against Shea, Trevizo, and Ramos, claiming that they violated A.R.S. § 40–360.41, *et seq.* That act establishes procedures whereby a public utility company, such as APS, can obtain indemnification from businesses and individuals who work around high voltage overhead power lines for injury to third parties caused by contact with the power lines.

All parties filed motions for summary judgment. The trial court denied the motion for summary judgment filed by APS. However, it granted the cross-motions for summary judgment filed by Shea, Ramos, and Trevizo. The trial court also entered judgment pursuant to rule 54(B), Arizona Rules of Civil Procedure, and APS appealed.

Snell & Wilmer by George H. Lyons, Joseph A. Kendhammer, Heidi L. McNeil, Phoenix, for defendant third-party plaintiff-appellant.

Jennings, Strouss & Salmon by William T. Birmingham, M. Byron Lewis, Phoenix, for third-party defendant-appellee Shea.

Sorenson, Moore, Evens & Burke by George R. Sorenson, Phoenix, for third-party defendants-appellees Ramos and Trevizo.

## ISSUES

We address two issues: (1) whether there are questions of material fact that preclude entry of summary judgment for Shea, Ramos and Trevizo, and (2) whether the third party defendants are liable to APS for damages that APS may be required to pay to the plaintiff because the third party defendants violated A.R.S. § 40–360.41, *et seq.*

## FACTS

Shea who operated the Shea Arabian Horse Ranch ordered hay from a salesman for Trevizo. Treviso was a hay broker. He employed Ramos as a driver and Ruelas as a part-time helper. On the morning of June 12, 1984, Ramos drove to the Shea Arabian Horse Ranch and entered the driveway. He stopped the truck and went to talk to Trevizo, Shea and another man to determine where to unload the hay. When Ramos returned to move the truck, he no-

## OPINION

GRANT, Judge.

On June 12, 1984, Ralph Ruelas, a young high school student, was seriously injured when he came into contact with a 7,200–volt overhead power line while working as

ticed the overhead power lines as they touched the hay. Shea saw the hay truck parked under the overhead power lines with the lowest power line lying on top of the load of hay. He also saw Ruelas seated on top of the load of hay. Ruelas climbed to the top of the load of hay as part of his normal duties and responsibilities as a helper in delivering hay. Ramos began to drive the truck forward under the power lines in response to directions from those who were present. Ruelas was still on top of the load of hay. Shortly thereafter Ruelas was injured when he came into contact with the overhead power lines.

## PROCEDURAL HISTORY

The APS initial third-party complaint included a claim for contribution under A.R.S. § 12–2501 and one for common law indemnity, as well as the statutory indemnity claim which is involved in this opinion. Shea sought relief from the first two claims through a special action filed in the Arizona Supreme Court. The court accepted jurisdiction and granted relief ordering the trial court to enter summary judgment against APS on the common law indemnity and contribution counts. *Shea v. Superior Court*, 150 Ariz. 271, 723 P.2d 89 (1986).

In granting this relief, the supreme court held that APS could not maintain an action seeking contribution under the Uniform Contribution Among Tortfeasors Act because A.R.S. § 12–2501 applied only to actions filed on or after August 31, 1984. The initial complaint was filed on July 10, 1984 and therefore A.R.S. § 12–2501 was not applicable. The supreme court also concluded that there could be no common law indemnity in this case because, "[s]uch indemnity is not permitted where the conduct of the indemnitee made him an 'active [participant] in the liability-creating event.'" *Shea*, 150 Ariz. at 274, 723 P.2d at 92 (quoting *Chrysler Corp. v. McCarthy*, 14 Ariz.App. 536, 538, 484 P.2d 1065, 1067 (1971)). The court stated that, "[b]oth APS and Shea actively participated in the event, even though APS's negligence was a failure to act and Shea's was a positive act." *Id.* We are then left only with the question of whether APS has a claim for indemnity under the overhead power line statute. A.R.S. § 40–360.41, *et seq.*

## SUMMARY JUDGMENT

In reviewing a grant of summary judgment, this court first determines whether there exists any issue of material fact which should have been submitted to the trier of fact. *Tribe v. Shell Oil Co.*, 133 Ariz. 517, 652 P.2d 1040 (1982). The evidence must be viewed in the light most favorable to the appellant and the appellant must be given the benefit of all inferences which could reasonably be drawn therefrom. *Id.*

APS raises several fact related issues. APS challenges the allegation that neither Ramos nor Trevizo was aware of the power lines before the accident. APS claims that Ramos was not only aware of the existence of the power lines but knew about Ruelas's presence on top of the hay load prior to the accident. In addition, APS alleges that Shea gave the truck driver directions knowing that the truck was beneath the power lines and Ruelas was on top of the load of hay. APS also disputes the record regarding whether Trevizo and Ramos directed Ruelas to get on top of the truck. APS claims there is a factual dispute in the record as to whether Shea was directing the activities of Ramos both before and at the time of the accident.

Shea, on the other hand, claims that he reported the sagging power line to APS several times. At least no later than January 19, 1984, APS was aware that its high voltage power line was several feet below the minimum height required by the National Electric Safety Code. This fact was verified by Joe Croman, an APS troubleshooter, who testified that he inspected the line during a routine maintenance patrol and prepared a maintenance order dated January 19, 1984. An APS work authorization order was issued on January 25, 1984, with directions to APS employees to "interset pole to gain proper clearance." In spite of this authorization, nothing was done by APS. The line was still below the minimum height when the accident occurred on

June 12, 1984, approximately five months after APS undisputedly had notice of the dangerous condition.

APS now seeks to have Shea, Ramos and Trevizo indemnify it in accordance with the terms of A.R.S. § 40–360.44(B) for the sums it might be required to pay to Ruelas. The trial court determined that APS had no statutory right to indemnity, and accordingly granted summary judgment in favor of all three third-party defendants.

Section 40–360.42 of the overhead power line and safety restriction statute provides in relevant part as follows:

> Unless danger against contact with high voltage overhead lines has been effectively guarded against as provided by § 40–360.43:
>
> 1. A person or business entity shall not, individually or through an agent or employee, require any other person to perform any function or activity upon any land, building, highway or other premises if at any time during the performance of any function or activity it is possible that the person performing the function or activity could move or be placed within six feet of any high voltage overhead line or if it is possible that any part of any tool or material used by the person could be brought within six feet of any high voltage overhead line during the performance of any function or activity.

"Person" and "business entity" for purposes of § 40–360.42 are defined in § 40–360.41. That section provides in relevant part as follows:

> 4. "Person" or "business entity" means those parties who contract to perform any function or activity upon any land, building, highway or other premises.

### A. *Gordon Shea*

■ We affirm the trial court's order granting Shea's motion for summary judgment. Section 40–360.42 is directed to those "persons" who contract to perform work which may bring a person, tool, or material used by the person within six feet of an overhead line. The person who con-

tracts to perform is the party who actually agrees to carry out the activity in proximity to the overhead power line; not the party, either a homeowner or a business, who contracts to have work performed on his premises. In this case, Shea is not a "person" who contracted to perform within the meaning of A.R.S. § 40–360.41. Rather, Shea simply contracted to have Trevizo Hay Company deliver hay to his property.

APS would have this court include in the words "contract to perform" not only the employer who carries out work in close proximity to an overhead power line, but also the party who enters into a contract with that employer to have the work performed. Such a reading of § 40–360.41 distorts the plain language of that statute. It is also in derogation of the legislative intent behind both §§ 40–360.41 and 40–360.42.

The Arizona overhead lines statute was adopted as a safety measure. *Monares v. Wilcoxson*, 153 Ariz. 359, 362, 736 P.2d 1171, 1174 (App.1987). The statute promotes safety by prohibiting work within six feet of a power line. The legislature has thus established, as a matter of public policy, that persons or businesses actually performing work in close proximity to power lines have the primary responsibility for safety. As the supreme court of Oklahoma stated in *Kimery v. Public Service Co. of Oklahoma*, 622 P.2d 1066, 1071 (Okla. 1980):

> The statutory burden of care imposed upon the public is intended to promote the safety and welfare of the general public by reducing the number of accidents involving electricity. The legislature determined it is far more effective and in the public interest to impose this burden on those persons who engage in activities near power lines than to require the utilities to maintain constant surveillance over the thousands of miles of power lines which it maintains.

*See also Savannah Elec. & Power Co. v. Holton*, 127 Ga.App. 447, 450, 193 S.E.2d 866, 869 (1972) ("intent of the Act is to protect workmen").

Section 40–360.44 provides a variety of penalties for violation of the overhead line statute:

A. A person or business entity or agent of the person or business entity who violates this article may be subject to a civil penalty in an amount not to exceed one thousand dollars to be imposed by the court in favor of the state to be deposited in the general fund.

B. If a violation of this article results in physical or electrical contact with any high voltage overhead line, the person or business entity violating this article is liable to the public utility operating the high voltage overhead line for all damages to the facilities and all costs and expenses, including damages to third persons, incurred by the public utility as a result of the contact.

At issue in this case is the provision of § 40–360.44(B) which allows the public utility to seek indemnification for damages paid to third persons as a result of their physical contact with the high voltage overhead line.

Holding the party who contracts to perform an activity near an overhead line liable for violations of the statute serves the legislative intent of promoting safety. The party who agrees to perform the activity should have sufficient knowledge of the work habits and equipment of his employees and agents to properly assess the danger of violating the six-foot prohibition. The performing party will likewise have control over the employee or agent who is in close proximity to the overhead line, and can order that employee not to violate the statutory prohibition. When an employer is involved in work that frequently brings his employees or agents into close proximity to overhead power lines, the statutory prohibition should encourage that employer to establish routine safety procedures that will minimize the risk of accidental contact. *Cohen v. Salt River Project,* 153 Ariz. 326, 329, 736 P.2d 809, 812 (App.1987).

Holding the homeowner or business that contracts to have work performed liable for violations of the statute does not serve the safety rationale of §§ 40–360.41—40–360.-45. In the usual case, a homeowner who contracts to have work performed on his premises will not be sufficiently familiar with the work or the procedures of the employer to know how the job will be carried out or what equipment will be used, and will therefore be unable to properly assess the danger of a statutory violation. Furthermore, a homeowner is not likely to be able to control the conduct of the employee who is working near the overhead line, and thus may not be able to prevent a statutory violation. Finally, because the homeowner will often be unfamiliar with the regular course of activity of the employee, the homeowner cannot be said to have "required" the employee to come within six feet of an overhead line, within the meaning of § 40–360.42.

## B. *Ignatio Ramos*

■ We affirm the trial court's order granting Ramos's motion for summary judgment. As a preliminary matter, Ramos is neither a "person" nor a "business entity" within the meaning of § 40–360.42. Section 40–360.41(4) defines a "person" or business entity as "those parties who contract to perform any function or activity upon any land...." Ramos is an employee of John Trevizo; Ramos did not contract to deliver hay to Shea's ranch.

In this regard, we note that § 40–360.-44(A), which allows for imposition of a civil penalty upon violation of the overhead line statute, specifically includes within its scope both agents of the person or business entity and the person or business entity itself. Section 40–360.44(B), the indemnification provision, applies only to persons or business entities defined in § 40–360.41(4). Therefore, APS may not seek indemnification from someone who is neither a person nor a business entity within the meaning of the overhead line statute.

The notification provision of § 40–360.43 provides additional support for the conclusion that APS may not seek indemnification from Ramos. The prohibition on work within close proximity to an overhead line of § 40–360.42 can be avoided through prior notification of the utility in accordance

with § 40–360.43. Section 40–360.43(B) provides:

B. The person or business entity responsible for performing the work in the vicinity of the high voltage overhead lines shall pay any actual expenses of the public utility operating high voltage overhead lines in providing arrangements for clearances, except in instances where the public utility operating high voltage overhead lines has installed lines within ten feet of an existing fixture or structure after the fixture or structure has been in place at the permanent location. The public utility is not required to provide the arrangements for clearances until an agreement for payment has been made.

In construing a similar notification provision in the Texas overhead line statute, the Texas Court of Appeals held that the obligation to notify the utility rests with the employer and not with the employee. *Ringo v. Gulf States Utilities Co.*, 569 S.W.2d 31, 34, (Tex.Civ.App.1978). The employee has no authority to act for his employer in negotiating with the utility and cannot bind his employer in an agreement to pay the expenses for any work done by the utility. *Id.; Grant v. Arizona Pub. Serv. Co.*, 133 Ariz. 434, 444–45, 652 P.2d 507, 517–18 (1982). Similarly, the employee has no authority to negotiate with the party contracting for the work to accept the financial burden to pay for those expenses.

C. *John Trevizo*

Section 40–360.41(4) defines "person" and "business entity" as "those parties who contract to perform any function or activity upon any land...." In this case at bar, Trevizo contracted to deliver hay to Shea Arabian Horse Ranch. Trevizo is plainly a person or business entity within the meaning of the overhead line statute. *See Cohen v. Salt River Project*, 153 Ariz. 326, 329, 736 P.2d 809, 812 (App.1987).

Having established that Trevizo is a person within the meaning of the statute, the issue is whether Trevizo violated the statutory prohibition of § 40–360.42 which restricts activity in close proximity to an overhead line. In order to determine if Trevizo violated the dictates of § 40–360.-42, it is necessary to interpret the terms "require" and "possible."

Trevizo argues that the term "require" implies that the employer order or mandate the employee to work in close proximity to an overhead power line. APS argues such an interpretation is unduly restrictive. APS would have us hold that it is sufficient that an employer require the employee to perform a function which, in the normal course of the employee's duties, would bring the employee within six feet of an overhead line.

The inquiry in this case must be whether or not Ruelas, the injured employee, normally climbed to the top of the stack of hay during delivery. No record was developed regarding this issue.

Section 40–360.42 prohibits an employer from requiring an employee to perform any function if it is "possible" that the employee will be brought within six feet of an overhead line. APS argues that, in order to find a violation of § 40–360.42, it is sufficient that the employee's activities happen to come within close proximity to the high voltage power lines during the course of his work, even if the employer or contractor did not anticipate that such contact would take place. To properly interpret the "possibility" of contact requirement of § 40–360.42, it is necessary to look at § 40–360.43 of the overhead line statute. Section 40–360.43 provides:

A. If any person or business entity desires to temporarily carry on any function, activity, work or operation in closer proximity to any high voltage overhead line than permitted by this article, the person or business entity responsible for performing the work shall promptly notify the public utility operating the high voltage overhead line. The person or business entity may perform the work only after satisfactorily mutual arrangements, including coordination of work and construction schedules, have been made between the public utility operating the lines and the person or business entity responsible for performing the work. Arrangements may include place-

356

ment of temporary mechanical barriers to separate and prevent contact between material, equipment or persons and the high voltage overhead lines or temporary de-energization and grounding or temporary relocation or raising of the high voltage overhead lines.

■ "Possibility" of a violation of the six-foot prohibition of § 40–360.42 can be measured by the notification requirement of § 40–360.43. A violation of § 40–360.42 will be deemed to have been "possible" where contact with the overhead line could reasonably have been avoided through prior notification to APS. Prior notification will be a reasonable alternative for the employer where either the employer or an agent are actually aware of a specific overhead line that presents a threat to an employee, regardless of whether the employer's activities involve repeated exposure to overhead lines. Prior notification to APS is also a reasonable alternative for an employer in cases involving repeated exposures to overhead lines. In repeated exposure situations, notification is necessary if the threat posed by the overhead line could have been discovered through reasonable investigation, regardless of whether the threat was actually discovered. *See Monares v. Wilcoxson,* 153 Ariz. 359, 362, 736 P.2d 1171, 1174 (App.1987).

Shea[1] argues that the unloading of hay is an activity which involves only casual exposures to overhead lines. Shea contends that the overhead line statute excludes random or casual occurrences. In this regard, Shea relies on *Savannah Elec. & Power Co. v. Holton,* 127 Ga.App. 447, 193 S.E.2d 866 (1972), which held that random or casual exposures to overhead lines were not covered by the Georgia overhead line statute. *Holton* further held that:

> [T]he persons and activities toward which the Act is directed are those businesses, whether giant corporations or one-man concerns, whose *usual activities* would foreseeably bring their employees within close proximity to high voltage lines.

*Id.* at 451, 193 S.E.2d at 869 (emphasis added).

An exemption from the strictures of the overhead line statute for casual or random occurrences is not justified by the plain language of the Arizona statute. Furthermore, such an exemption would not only create unnecessary confusion in the application of the overhead line statute, but would ill-serve its safety purposes. The interpretation that we have given § 40–360.42 ensures that, where a so-called "random or casual occurrence" is involved, the employer will be liable for indemnification only where he or his agent has actual knowledge of a threat posed by a specific overhead power line. *Monares v. Wilcoxson,* 153 Ariz. 359, 362, 736 P.2d 1171, 1174 (App.1987).

## STATUTORY INDEMNIFICATION

■ Having determined that a fact finder could find that Trevizo violated the overhead power line statute, we address a followup question prior to disposing of the matter. If it is found that APS negligently maintained its power line, would such negligence preclude APS from obtaining indemnification pursuant to A.R.S. § 40–360.44 against Trevizo?

Twelve states other than Arizona have adopted overhead line statutes. Of these, three give the owner of the overhead line a right to sue the person violating the statute and to recover for "liability" it incurs. These three states purport to grant the utility maintaining the line a private right of action. Texas, by virtue of a split decision from a federal court, appears to permit a utility to obtain indemnification for any injury that results from both its violation of law and its own negligence in maintaining the line. *Moore v. Southwestern Elec. Power Co.,* 737 F.2d 496 (5th Cir. 1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985). The Alabama and Georgia statutes specifically provide

---

1. Trevizo does not specifically advance the random occurrence argument. However, in the introduction to his answering brief Trevizo requests that the court first consider Shea's answering brief. It is thus possible that Trevizo has incorporated the random occurrence argument by reference.

that the overhead line law does not relieve a utility of liability, nor does it reduce the utility's duty or degree of care. Ala.Code § 37–8–55 (1975); Ga.Code Ann. § 46–3–38 (1982); *cf. Malvarez v. Georgia Power Co.*, 250 Ga. 568, 300 S.E.2d 145 (1983); *see also Ringo v. Gulf State Utilities Co.*, 569 S.W.2d 31 (Tex.Civ.App.1978).

The Arizona statute is silent on the role of a utility's negligence in its right to indemnification. The appellees contend, and we agree, that under the facts presented in the trial court, APS could be found negligent and therefore liable to the plaintiff. Common law imposes a duty on a distributor of electric power to act reasonably; to take precautions commensurate with the dangers involved when it can anticipate that persons may come into contact with its lines. *Grant v. Arizona Pub. Serv. Co.*, 133 Ariz. 434, 652 P.2d 507 (1982). Evidence was presented that APS was aware of the sagging power line at the Shea Ranch and therefore, APS could be found negligent for failing to remedy that danger. *Id.; Restatement (Second) of Torts*, §§ 447, 449 (1965); *see also* Annot., *Electric Power Co. Liability*, 69 A.L.R.2d, 93, 97, 98 (1960).

Division 2 of this court recently held, "Further, we find no constitutional infirmity in the statutory provision for indemnification where the person or business entity working adjacent to power lines has failed to give the requisite notice, [under A.R.S. § 40–360.43] even where the injury results in whole or in part from the utility's independent negligence." *Tucson Elec. Power Co. v. Swengel-Robbins Const. Co.*, 153 Ariz. 486, 488, 737 P.2d 1385, 1387 (App. 1987). We agree. We therefore reverse the summary judgment as to Trevizo and remand for further proceedings. The summary judgment as to the other defendants is affirmed.

EUBANK, P.J., and HAIRE, J., concur.